UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| REBECCA LYNN CHESSER | ) | |
| | ) | |
| V. | ) | NO. 2:12-CV-214 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's application for disability insurance benefits were denied following an administrative hearing before an Administrative Law Judge ["ALJ"]. This action is one for judicial review of that decision. The plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 13], and the defendant Commissioner has filed a Motion for Summary Judgment [Doc.15].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues

differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff is a "younger" individual, being 39 years old at the time of her alleged disability onset date of May 14, 2009. She has a high school education. It is undisputed by the parties that she cannot perform any past relevant work.

It must be noted at this point that a previous application for benefits was denied by the same ALJ in a decision rendered May 13, 2009, thus her presently asserted onset date of May 14th. At that time, upon a great deal of the same evidence, the ALJ found that the plaintiff had the residual functional capacity for light work, with a sit/stand option that does not require greater than occasional postural activities. That hearing decision became the Commissioner's final decision as of that time.

A key piece of evidence in that case was a consultative examination undertaken at the behest of the Commissioner by Dr. Edith Smith on July 29, 2007. Dr. Smith diagnosed fibromyalgia and obesity. Dr. Smith opined that the plaintiff could lift 30 pounds occasionally and 20 pounds frequently. Dr. Smith also opined that the plaintiff had some limitations on standing and walking, which the ALJ rejected at that time. In any event, as will be seen, the ALJ in his present decision found that the plaintiff is now more limited and is capable of a reduced range of sedentary work.

Plaintiff summarizes her medical history as follows:

Records from the Center for Integration Medicine hereinafter referred to as the "Castle Clinic" indicate a diagnosis of fibromyalgia since they began seeing the claimant in May of 2006. (TR 282) At the time of her initial visit the claimant weighed 256 lbs and was complaining of severe fatigue and muscle aches all over. (TR 278) On the 6/21/2006 visit the claimant complained of increased "fibro-fog" affecting her ability to function and her memory. The physician prescribed Amitriptyline, Naproxyn and Cymbalta for her care. (TR 273) On 7/20/2006 Castle Clinic reported her weight had increased to 263 lbs and she was experiencing chronic pain but better able to sleep with Elavil. (TR 270) On 8/23/2006 the Claimant reported Flu—like symptoms, muscle cramps, not sleeping well, various pains and aches throughout her body. Her weight had increased to 268 lbs. (TR 268) On 10/23/2006 Castle reported the claimant was having flu like symptoms with "severe" pain in her legs, arms and upper back. The notes reported a 20 lb weight increase over 6 months with her weight being 271 lbs on that visit. (TR 264-65) On 12/27/2006 the Claimant reported severe pain in thighs, back and forearms. The note stated the claimant's weight had increased to 281 lbs. (TR 260-261) On 1/10/2007 the Claimant reported increased back, leg and arm pain and having difficulty with being active physically. She again complained of "brain fog" occurring causing confusion. (TR 258-259) The notes reflect she was going to attempt to diet and meet with a nutritionist. On 1/31/2007 notes from the Castle Clinic indicate the claimant was receiving Naproxyn, Ultram and Elavil for fibromyalgia symptoms. At this visit the doctor first encouraged exercise. (TR 252-253)

On 2/12/2007 Castle reported the fibromyalgia was worse and physical therapy was causing too much pain. The Doctor noted the Claimant stated she wants to lose weight. (TR 248-249). The visit of 4/10/2007 revealed the claimant's weight was down to 279 lbs and she was attending a fibromyalgia support group. (TR 245-246) On 6/5/2007 Castle reported her weight as 274 lbs, she was sleeping better and was feeling well that day. (TR 241-242) This mild improvement proved to be short lived as the notes of 9/21/2007 indicate she was again experiencing more pain and extreme fatigue and her weight had increased to 288 lbs. The Claimant reported she couldn't do exercise due to the pain. (TR 237-238) On 12/7/2007 the Claimant's weight had remained stable and was down to 286 lbs and a diagnosis of RLS was noted as being uncontrolled. The fibromyalgia was reported as "fairly well". (TR 233-234)

By 1/7/2008 Castle Clinic notes reported the Claimant's weight had increased to 292 lbs and she was sleeping well, but she was having increased nerve and muscle pain. Medications prescribed by Arthritis Associates including Mirapex and Requip were reported to not be helping with the RLS. Her Cymbalta was increased. (TR 230-231) On 4/9/2008 the Claimant's weight had lowered to 281 lbs and she was taking Zanaflex and Darvocet for her symptomology. (TR 227-228) Her 7/9/2008 visit revealed she was doing "fairly well" but with pain and fatigue causing

continued problems. On 11/14/2008 claimant reported continued chronic pain and fatigue and she was continued on Lyrica and Cymbalta. (TR 219-220)

On 5/19/2009 Claimant's weight had increased to 299 and she reported increased pain and fatigue. (TR 216-217) By 10/30/2009 her weight was decreasing and reduced to 282 lbs. She was placed on Phentermine for weight loss assistance. (TR 604) She continued to report leg cramps, decreased sleep, decreased concentration, leg pain and fatigue. (TR 604) On the last reported visit in the record of 5/24/2010 she reported continued back pain, fatigue and weakness. Her weight was reported as up to 294 lbs. (TR 597-598)

The Claimant has seen a specialist, Dr. Morris, a rheumatologist at Arthritis Associates, since 2006 for fibromyalgia. (TR 357) Dr. Morris reported on 8/19/2007 the claimant was in a fibromyalgia support group and was suffering from severe fatigue. The record indicates she had fibromyalgia tenderness in various portions of her body and trace edema. (TR 358) On 4/9/2007 the diagnosis of RLS was given and she was placed on Sonata and Requip to address it. She was given Trazadone for sleep issues. (TR 358) On 5/7/2007 it was reported she had positive signs of point tenderness with fibromyalgia but was sleeping better. (TR 359) On 6/4/2007 the claimant reported "doing ok" but her RLS symptoms after being placed on the Requip had started returning and she was having pain in her back, lower back, hips, thighs with occasional severe muscle spasms. (TR 359) It was reported the Sonata was no longer working. She was prescribed lidoderm patches. (TR 359) On the 7/2/2007 visit she had positive tenderness in fibromyalgia points and started on Lyrica. (TR 360) On 8/6/2007 she described the Lyrica as helping with muscle pain but not spine pain. She again had an positive tenderness in fibromyalgia points. (TR 361) On 9/4/2007 she reported "still hurting" with only some help from the Lyrica. Requip was not helping with the RLS and she was placed on a trial of Mirapex.. On 10/2/2007 the claimant reported some improvement with only mild fibromyalgia point tenderness. (TR 362) The improvement proved to be short lived. The claimant reported on 11/5/2007 increased hip pain and the Mirapex not helping with the RLS. She was having some pain control with the Lyrica and Ultram mix. She had increased tenderness in fibro points on examination. (TR 362) Her next visit revealed she had a fibromyalgia flare up that had lasted 7 days straight and she was reported to have been crying from the pain.. (TR 414) On 3/3/2008 it was reported that the claimant was now taking Klonopin for RLS relief and it was working. (TR 414) Again increased tenderness on fibro points was noted. (TR 414) On the 4/4/2008 visit the claimant reported feeling overly sedated. (TR 415). By her 5/20/2008 visit she was feeling a great deal of fatigue and feeling generally worse. (TR 416). She continued to report severe pain and fatigue on her visits of 6/23/2008 (TR 416-417) and 7/26/2008 (TR 418) On her 10/14/2008 visit she complained of increased "brain fog", fatigue, short term memory issues and being very limited physically. (TR 419). On the 11/18/2008 visit she was reported to weigh 289 lbs and had received about 3 days of relief after receiving TP injections. She complained of still being in a lot of pain and experiencing severe fatigue. The doctor reported positive tenderness over fibro points. (TR 420) On the 12/10/2008 visit she reported "intense fatigue",

examination revealed positive tenderness in the fibro points and an injection was given to get some relief to her left leg pain. (TR 421) On her January 2009 visit she reported hurting along her spine and neck areas and needing an injection in both lower traps. Again, she was positive for fibro point tenderness. (TR 422) On 3/9/2009 the claimant reported not sleeping well and having considerable fatigue. (R 423) On the 4/20/2009 visit low back pain injections were considered and she was again positive for fibro point tenderness. (TR 424) On 6/1/2009 it was reported the injections helped some but she had diffuse fibro point tenderness on examination. (TR 425) On 6/29/2009 Claimant again reported "brain fog", fatigue being reduced by 50% with her pain remaining the same. She again tested positive for tenderness in fibro points. (TR 649) The visit of 7/20/2009 revealed the prescription drug Savella was helping with fatigue but not quite as good with the pain. She was attempting to walk to the mailbox each day and was looking into pool therapy at the wellness center. (TR 650) She again showed positive fibro point tenderness on examination . (TR 650) By the 8/30/2009 visit the Savella was reported to no longer to be helping the claimant. She was crying with pain, increased depression, agitated and she continued to indicate increased positive fibro point tenderness. (TR 651) On 9/12/2009 it was reported the Claimant was back on Cymbalta and her depression had decreased and she was receiving some pain reduction. (TR 652) On the 1/25/2010 visit the claimant reported more lower back pain and nerve pain in both legs. She reported fibromyalgia flare ups happening 4 to 5 times per month. (TR 658) On 4/4/2010 she reported increasing fibromyalgia flare ups with increased muscle pain. (TR 654) On 5/4/2010 the Claimant reported she felt she was making no progress and required four more injections to help with the pain. (TR 655) On 6/10/2010 she again complained of significant fatigue and diffuse pain. The last exam reported in the record was on 8/5/2010 which stated the claimant on examination was tender at multiple fibromyalgia tender points, it was noted that she had increased fibromyalgia flare ups during her menses and she was still on Cymbalta and Lyrica, but taking Zanaflex and Darvocet when she experienced the fibromyalgia flare ups. (TR 660)

[Doc. 14, pgs. 5-9]

Plaintiff also summarized the medical assessments submitted by her treating and consultative physician as follows:

Claimant's treating physician, Dr. Chris Morris, completed a Medical Assessment of the claimant's ability to do work on 8/30/2010. (TR 705-706) He opined the claimant due to her "very tender fibromyalgia points" causing weakness and her deconditioned body due to her intolerance of minimal physical activity the claimant could not work a full time job at any exertional level. He opined the claimant could occasionally for up to 1/3rd of an 8 hour workday lift a maximum of less than 10 lbs; frequently lift and/or carry from 1/3rd to 2/3rds of an 8 hour

> workday a maximum of less than 10 pounds; stand and or walk for a total of less than 2 hours in an 8 hour workday; and sit less than about 6 hours in an 8 hour workday. (TR 706) He didn't feel she could work a full time work day without having to withdraw two or more times a day. (TR 706)
>
> The Claimant's treating physician at the Castle Clinic reported the same limitations and responses as those of Dr. Morris on 8/24/2010. (TR 708-709) The report states that these limitations were made and supported by an assessment consisting of reliance on the patient's reports and the records of Arthritis Associates for their treatment of her fibromyalgia. (TR 708)
>
> The Claimant submitted an Independent Medical Evaluation from Dr. Steven Baumrucker dated November 6, 2010. (TR 702-703) He reported the claimant met all the diagnostic criteria of fibromyalgia. He reported on physical examination that she had multiple tender points including her feet, thighs, calves, low back, upper back, chest bilaterally and the inferior neck. He opined the claimant would be unfit to do even sedentary activity and appears to be unemployable for any job. He mentioned the number of medications she is on and the cognitive adverse effects they would be expected to have. (TR 703)

[Doc. 14, pgs. 9-10].

There were also two state agency physicians who submitted opinions after reviewing all of the evidence in the plaintiff's record as of the time of their respective reports. On August 3, 2009, Dr. Robert T. Doster opined that the plaintiff could occasionally lift and carry 20 pounds and frequently carry 10 pounds. He found she could stand or walk for about 6 hours in an 8 hour workday and sit for a corresponding amount of time. He limited her to occasional postural activities, except for climbing ladders, ropes or scaffolds, which he opined she could never do. (Tr. 572-73). On September 25, 2009, Dr. Reeta Misra reviewed the record, including Dr. Doster's report. Dr. Misra found there was no evidence that plaintiff's condition had worsened, and that medication had helped her pain. Dr. Misra noted plaintiff had been advised by her doctors to "increase activity as tolerated and look into possible pool therapy." (Tr. 580).

At the administrative hearing on September 17, 2010, the ALJ called Dr. Burgin

Dossett as a "medical expert." Dr. Dossett had reviewed the plaintiff's file and heard her testify. He was asked by the ALJ to "give me your opinion of her situation." Dr. Dossett stated that "her diagnosis (fibromyalgia) doesn't have much in the way of objective evidence..." On cross-examination he stated that he was not a "true believer in fibromyalgia," as a bona fide medical condition. In essence, his testimony was worthless other than noting the absence of much objective evidence for a condition which he admitted did not lend itself to such. (Tr. 42-43).

The ALJ then called Donna Bardsley as a vocational expert ["VE"]. Ms. Bardsley was asked to assume a person "can do light work, sit/stand option, occasional posturals, avoid concentration exposure to hazards, limited to simple routine repetitive work." When asked if there were jobs, Ms. Bardsley stated that there were 3,900 regional jobs and 2.5 million in the nation. He then asked to assume the same person, but that they were limited to sedentary work with the same restrictions except for the sit/stand option. When asked if jobs were available for that person, she stated there were 2,000 in the region and 1.5 million in the nation. (Tr. 44-45). When asked by plaintiff's counsel if any jobs were available for a person with the restrictions opined by Dr. Morris, the VE stated there would be none. (Tr. 46).

In his hearing decision, the ALJ found that the plaintiff had severe impairments of fibromyalgia, restless leg syndrome, obesity and mild depression. (Tr. 13). He discussed the plaintiff's treatment records from Castle Clinic in great detail. He noted that she was advised to lose weight through diet and exercise, and noted her lack of weight loss, with weights running between 282 and 299 pounds during the period at issue. He noted her medication

history and the success achieved as described in Dr. Morris's records. He mentioned that pool therapy had been recommended and that plaintiff had not followed through with that suggestion. He discussed the state agency physicians opinions. He also discussed her mild depression. He then mentioned the independent evaluation of Dr. Baumrucker obtained by plaintiff's counsel. He mentioned Dr. Dossett and the lack of objective evidence. He also mentioned Dr. Dossett's statement regarding plaintiff's obesity and that it was "a contributing factor to her symptoms." He also mentioned that Dr. Dossett felt "fibromyalgia was used too much as a wastebasket term for people who could not be diagnosed otherwise." (Tr. 14-15).

After discussing plaintiff's mental state, which is not an issue in this action, found that plaintiff had the residual functional capacity ["RFC"] for "simple, routine, repetitive work at the sedentary level of exertion that does not require greater than occasional postural activities and that does not involve concentrated exposure to hazards." (Tr. 16). He then discussed the medical evidence on which this was based and the weight given to various opinions. He gave "some weight" to the state agency physicians, but noted they opined the plaintiff could perform light work while he limited her to the sedentary level of exertion. He gave "little weight" to the opinion of the treating physician, Dr. Morris, who opined the plaintiff was unable to perform even sedentary work because that opinion "was not consitent with their records which show that the claimant was doing generally well on medications." As for Dr. Baumrucker, he gave him "little weight as his opinion was apparently based on the claimant's subjective complaints and a one-time evaluation at the request of the claimant's attorney." He then found that even though the plaintiff's depression was

controlled with medications, he was limiting her to simple, repetitive jobs. Even though he felt he could have relied completely upon his earlier RFC finding from 2009 of light work, he gave plaintiff "the benefit of doubt in limiting the claimant to a narrow range of sedentary work activity." (Tr. 17).

He then stated his opinion regarding plaintiff's credibility. He found that her allegations of pain and other limiting symptoms were not completely credible. He based this, in part, on Dr. Dossett's opinion, both as to the degree of pain and her failure to lose weight as recommended by her doctors as a means of mitigating her symptoms. He noted her "rather limited lifestyle" but opined that it was "self imposed" and not consistent with her limited treatment. (Tr. 17).

Although she could not return to her past relevant work, there were a substantial number of jobs she could perform with her RFC. Accordingly, she was not disabled. (Tr. 18-19).

Plaintiff first asserts that the ALJ did not give required, appropriate weight to the medical opinions of treating physician Morris, or medical examiner Dr. Baumrucker. Second, she states that the AlJ erred in finding her not completely credible.

It is, of course, true that the opinions of treating physicians are entitled to great consideration, and a rejection of their opinion must be well explained by the ALJ. While it is no doubt true that fibromyalgia is a diagnosis arrived at by elimination of other causes which do show objective findings of their existence, it is also true that it is a real condition. While it is true that SSR 12-2p, which deals with confirmation of the condition of fibromyalgia, did not exist in 2010 when the hearing was held and the decision handed down,

it is also true that the ALJ recognized that plaintiff *did* have fibromyalgia. Unlike Dr. Dossett, the ALJ found that plaintiff did have this severe impairment. However, as the defendant points out, a diagnosis of any condition which does not per se meet a listed impairment does not equate to automatic entitlement to benefits. As with any severe impairment, it is the limitations on a person's ability to engage in work-related activities caused by that impairment which is at issue.

Dr. Morris opined that the plaintiff could do virtually nothing. However, his treatment notes indicated conservative treatment, and treatment which, when complied with, made the plaintiff more functional. He and others encouraged the plaintiff to lose weight, believing that the physical activity necessary to achieve this would be painful to a degree, but they encouraged her nonetheless because of the future gains to be achieved by it. Also, the record contains the opinions of the state agency doctors who, besides noting the noncompliance with the recommendation to lose, felt plaintiff could do light work even with her fibromyalgia so long as she was compliant with her medications. The opinions of state agency physicians can be given greater weight than those of treating physicians if the ALJ describes the reasons for doing so. *See, Ealy v. Commissioner of Soc. Sec.* 594 F.3d 504 (6th Cir. 2010); *Combs v. Commissioner of Soc. Sec.,* 459 F.3d 640 (6th Cir. 2006); and *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (6th Cir. 1994). Here, he gave valid reasons for the lesser weight he gave the opinion of Dr. Morris.

Dr. Baumrucker was not a treating physician. The Court tends to agree totally with the plaintiff's argument that the fact plaintiff's counsel paid a physician or psychologist to perform an evaluation and give an opinion is not, in and of itself, a basis to reject the opinion

out of hand, any more so than would be the opinion of a consultative examiner hired by the Commissioner. However, the ALJ also noted that this was a "one time" examination. That is a sparse reason also, but the ALJ is not required to go into elaborate detail in explaining the weight given to a non-treating source. In any event, the opinions of the state agency opinions support the ALJ no less with Dr. Baumrucker than they did with Dr. Morris.

The Sixth Circuit has stated that "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm. of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). However, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Id.* Here, the ALJ, while acknowledging the existence of fibromyalgia, and finding that plaintiff had it, he noted the paucity of objective findings, the conservative treatment, the plaintiff's noncompliance with the recommendations that she lose weight in spite of experiencing some discomfort, and the notations that her pain medications were helping as reasons for not believing she was totally incapable of a reduced range of sedentary work.

Last but not least, there should be compelling evidence of error present before taking away the prerogative of the trier of fact to determine credibility. The ALJ observed the plaintiff, heard her testimony, and observed her demeanor. Without the record clearly showing he was "just plain wrong," or that he lacked any substantial evidence for his credibility determination, great deference should be given his credibility decision. He may in fact *be wrong*, as may *any* trier of fact, administrative or judicial, in a particular case. But he came to the conclusion he did, and explained it adequately.

It is therefore respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 13] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 14] be GRANTED.[1]

Respectfully submitted,

s/ Dennis H. Inman
United States Magistrate Judge

[1]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).